UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TANYA INGRAM,<br><br>    Plaintiff,<br><br>v.<br><br><br>The CITY OF NEW YORK,<br><br>    Defendant. | CIV. NO.<br><br>ECF<br><br><br><br><br>COMPLAINT<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, TANYA INGRAM, by her attorneys Quinn Emanuel Urquhart & Sullivan, LLP, for her Complaint against Defendants, states as follows:

## INTRODUCTION

1. In February 2013, Plaintiff Tanya Ingram, a Deaf woman who communicates via American Sign Language ("ASL"), was involved in a minor car accident in Manhattan. Ms. Ingram immediately sought the assistance of the New York City Police Department ("NYPD"), asking a nearby school security guard through the use of simple gestures to call the police.

2. After a long wait, two NYPD officers arrived to a calm scene, where Ms. Ingram was waiting patiently inside her car. But the NYPD officer did not provide Ms. Ingram with the assistance she had requested. Instead, the officers refused to provide any reasonable manner through which to communicate with Ms. Ingram and then arrested her, handcuffing her hands and thereby eliminating completely her only means of communication.

3. In so doing, the NYPD officers ignored Ms. Ingram's indications that she was deaf and her requests to communicate with her in a manner that she could understand. Instead, the officers relied upon a description of the traffic accident and events that followed from the

1

other driver—even though it was Ms. Ingram who had sought the NYPD's assistance. The officers spoke at length with the other driver and, based entirely on misinformation provided, the officers searched Ms. Ingram's car and decided to arrest her. Without informing Ms. Ingram that she was under arrest, notifying her of her rights, or otherwise communicating any information, the officers forcibly and roughly pulled Ms. Ingram from her car and placed her in handcuffs, injuring her shoulder and preventing her from attempting to communicate.

4. Following Ms. Ingram's arrest, the NYPD continued to ignore its legal responsibility to communicate with Ms. Ingram or explain why she was being arrested. Ms. Ingram sat in a cell for hours in pain, entirely unaware of why her attempt to report a car accident and seek help from the police had led to her violent arrest and incarceration. In addition, the officers required that a physician clear Ms. Ingram before her release for no other reason than because she is deaf. Ms. Ingram spent the night at multiple precincts and a hospital before being released.

5. After months of criminal proceedings, the prosecutor eventually notified the court that it would not pursue the criminal charges and the court dismissed the charges against Ms. Ingram.

6. As a result of the NYPD's refusal to provide reasonable accommodations for Ms. Ingram's disability to allow for effective communication with Ms. Ingram, the NYPD searched her car, arrested her based on misinformation, detained her without explaining the reason for her arrest or providing notice of her *Miranda* rights, unnecessarily detained her for the simple reason that she is deaf (for which the officers deemed medical clearance necessary before release), and then maintained an unwarranted prosecution against her. The officers' failure to make any effort

to obtain an ASL interpreter or simply to provide a notepad and pen for communicating via note-writing led to violations of Ms. Ingram's civil rights.

7. The NYPD's misconduct caused Ms. Ingram to suffer physical and mental injuries that persist to this day. Ms. Ingram now brings this civil rights action seeking damages and injunctive relief for the NYPD's violations of her rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

## PARTIES

8. Plaintiff Tanya Ingram is, and at all relevant times was, a resident of the City of New York. Ms. Ingram is Deaf and communicates via ASL, which requires the use of her hands. Ms. Ingram also has some ability to communicate through gesture, handwriting, or typing if needed.

9. Defendant City of New York ("City") is a municipal body organized and existing under the laws of the State of New York, and is authorized by law to maintain a police department. Defendant City of New York does, and did at all relevant times, operate, maintain, manage, supervise, and control the New York City Police Department as part of and in conjunction with its municipal function.

10. The NYPD is a municipal police force and agency organized and existing under the laws of the State of New York and the City of New York.

## JURISDICTION AND VENUE

11. This court has jurisdiction over the federal law claims under 28 U.S.C. § 1331 and may exercise supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367.

3

12.     Venue under 28 U.S. Code § 1391 is proper in the United States District Court for the Southern District of New York because the acts in question occurred in the State of New York, New York County, and the defendants are subject to personal jurisdiction therein.

## STATEMENT OF FACTS

**A.     The Car Accident**

13.     On the afternoon of February 26, 2013, at approximately 3:15 p.m., Ms. Ingram was driving from her home in Harlem to house-sit for a friend in Brooklyn.  After turning left from Second Avenue onto 120th Street heading east, she was involved in a traffic accident with a car in front of her driven by a woman named Loren Perez.

14.     Due to the accident, both cars came to a stop in the middle of 120th Street between Second Avenue and First Avenue.

15.     Ms. Perez got out of her car and began rushing toward Ms. Ingram's vehicle.  It appeared to Ms. Ingram that Ms. Perez was angry, and that she was shouting words, but Ms. Ingram could not hear or understand Ms. Perez.

16.     Ms. Ingram was unable to communicate with Ms. Perez and felt threatened by Ms. Perez's body language and demeanor.  Fearful of what Ms. Perez might do, Ms. Ingram picked up a small metal pipe that she had in her car and exited the car, gesturing to Ms. Perez to back away with her free hand.  At no time did Ms. Ingram swing the pipe, nor did she ever attempt to strike Ms. Perez.

17.     Ms. Perez ultimately walked away from Ms. Ingram's car and began speaking with nearby bystanders.

18.     Once Ms. Perez had walked away, Ms. Ingram returned the pipe to her car and went to seek assistance related to the car accident.  Because Ms. Ingram could not call the police

herself to report the accident, she approached a school security guard, Mr. Rick Nurse, who was standing outside a school near the scene of the accident, and, through gesture, asked him to call the police.

19. For instance, Ms. Ingram put her fists together to indicate the collision between the car and then pointed to her ear to indicate she is deaf. On information and belief, based on Ms. Ingram's gestures, Mr. Nurse understood that Ms. Ingram is deaf, and called the police.

20. Ms. Ingram and Ms. Perez moved their cars to the south side of 120th Street to avoid obstructing traffic. Ms. Ingram parked her car at a distance behind Ms. Perez's car.

21. Approximately 30 minutes later, before any police officers arrived on the scene, an ambulance arrived and pulled up in front of Ms. Perez's car. Ms. Ingram saw Ms. Perez walk to the ambulance with a child. Ms. Ingram sat inside her car.

**B.    The NYPD's Refusal To Communicate Effectively With Ms. Ingram In Responding To The Traffic Accident**

22. Approximately 45 minutes after the accident, two police officers, Officer Daniel Troyer and Officer K. D. Outlaw, arrived on the scene.

23. When the officers arrived, Ms. Perez was near the ambulance and Ms. Ingram was seated inside her car. Mr. Nurse approached the officers in their vehicle and appeared to have a brief conversation with them.

24. The police officers then approached Ms. Ingram's car, and upon seeing them approach, Ms. Ingram exited her car as well. Officer Outlaw stopped approximately two feet in front of Ms. Ingram and Ms. Ingram could see he appeared to be speaking.

25. Ms. Ingram was unable to hear or understand what Officer Outlaw was saying. Ms. Ingram tried to communicate that she is deaf by hand gestures, including by pointing at her ear, and gestured a request to write a note. Officer Outlaw did not supply a notepad for writing

5

notes as a means of communication or otherwise provide Ms. Ingram with a manner of effective communication as Ms. Ingram had requested.

26. Thus, despite the obvious signals demonstrating that Ms. Ingram is deaf, and in spite of her clear gestures, such as pointing to her ear and shaking her head, indicating her inability to hear and requesting reasonable accommodation, Officer Outlaw never communicated with Ms. Ingram in a manner that she could reasonably understand.

27. Displaying visible irritation, the officers walked away from Ms. Ingram toward the ambulance, where Ms. Perez had gone. On information and belief, the officers spent approximately twenty minutes speaking with Ms. Perez, during which time Ms. Ingram was waiting inside her car.

28. After speaking with Ms. Perez, Officer Outlaw returned to Ms. Ingram's car. Ms. Ingram could see that he was speaking, but could not hear or understand him. At some point, Officer Outlaw gestured to Ms. Ingram's car keys.

29. Ms. Ingram again gestured indicating that she could not hear Officer Outlaw and did not understand. Officer Outlaw did not try to communicate with her in writing or request an interpreter.

30. After several futile attempts at communicating with Officer Outlaw, Ms. Ingram handed him her car keys. She did not know why he wanted them.

31. Without further gestures or other communications that Ms. Ingram could understand, Officer Outlaw proceeded to the back of the vehicle and opened her trunk. Ms. Ingram continued to gesture to indicate her lack of understanding regarding the words he was speaking aloud and the reasons for his actions. At no point did Ms. Ingram ever give consent for Officer Outlaw to open the trunk to her car.

32.     Despite his failure to communicate with Ms. Ingram in any manner that would allow Ms. Ingram to understand what was happening, Officer Outlaw gestured to indicate a long, thin object. While Ms. Ingram initially did not understand what Officer Outlaw was requesting, she eventually guessed that his gestures were intended to indicate a pipe.

33.     Based on her interpretation of Officer Outlaw's gesture, Ms. Ingram retrieved the pipe from the driver's side door of her car. Officer Outlaw snatched the pipe from her hands and walked back to the ambulance. At this time, Ms. Ingram did not understand why Officer Outlaw was interested in the pipe.

34.     Sometime later, Officer Outlaw returned to his police car, and, standing outside his vehicle, began to write what appeared to be a police report. At this time, Officer Outlaw stood approximately 10 feet away from Ms. Ingram.

35.     At the same time, an emergency medical technician (EMT) walked from the ambulance toward Ms. Ingram's car and appeared to be speaking aloud to her. Ms. Ingram immediately gestured that she is deaf and gestured a request to write a note in the same manner as she had previously gestured to Officer Outlaw—pointing to her ear and shaking her head to indicate she is deaf and mimicking writing a note to ask to communicate via writing. The EMT appeared to understand her request immediately and become aware of her deafness, because he pulled out a piece of paper and pen for Ms. Ingram to communicate in writing.

36.     Through a written note, the EMT asked Ms. Ingram whether she was injured and needed help. After a brief exchange of written notes, the EMT provided Ms. Ingram with an ice pack for her wrist. Officer Outlaw was within 10 feet of Ms. Ingram and the EMT during this interaction.

37.     The ambulance and the EMT subsequently left the scene.

38. Based on her observations of the police officers' body language, Ms. Ingram began to believe that the officers had heard an account of the car accident from Ms. Perez that implicated Ms. Ingram. Concerned that they would not consider her account of the accident and would not communicate with her in a manner that she could understand, Ms. Ingram typed a note on her phone, which read, "You did not understand me. That's not right. I know she's lying to you. How can I tell you my story? I want my rights. Call interpreter."

39. Ms. Ingram approached Officer Outlaw in his vehicle and tried to show him the note. Officer Outlaw glanced at the note, but then expressed visible annoyance and ignored Ms. Ingram.

C.  **The NYPD's Forcible Arrest And Lengthy Detention Of Plaintiff**

40. After Ms. Ingram returned to her car, a police van arrived and parked behind her car. Officer Outlaw approached the police van, and Ms. Ingram could see Officer Outlaw and other officers inside the van speaking with each other. She saw that the officers were laughing and appeared to be mocking her use of gestures.

41. During this time, Ms. Ingram found a card in her car identifying her as deaf, that she intended to show to the police officers. However, before she could do so, she felt vibrations from a strong banging on the driver's side window. Ms. Ingram looked up and saw Officer Troyer and Officer Outlaw standing outside her car.

42. Ms. Ingram rolled down the car window and remained seated. Officer Troyer appeared to say something to Ms. Ingram, and both officers laughed. Officer Troyer then opened the car door and tried to forcibly remove her from the vehicle. Ms. Ingram did not understand what the officers were trying to do or why. The officers did not communicate to her in a manner

8

she could understand that Ms. Perez had made accusations against her, and that they were detaining her.

43. Terrified, Ms. Ingram tried to voice the words "no" and "mom" and hold up her phone to indicate she wanted to call her mother. Officer Outlaw then grabbed Ms. Ingram's arm and roughly yanked her out of the car. The officers then forcefully and tightly handcuffed Ms. Ingram, eliminating her only effective means of communication. Because Ms. Ingram was not informed that she had been accused of a crime and was being arrested, and could not hear anything the officers were saying to her, she did not have the opportunity to avoid being forcefully arrested by complying voluntarily. As a result, Ms. Ingram sustained injuries to her shoulder.

44. Ms. Ingram, extremely frightened and utterly bewildered as to the reason for her arrest began crying and repeatedly tried to audibly shout, "Why?"

45. Except as noted above, at no point during any of these events did either officer attempt to communicate with Ms. Ingram through gestures, written communications, or sign language. No sign language interpreter was ever brought to the scene despite the length of time the officers remained at the site of the accident. Ms. Ingram did not receive *Miranda* warnings in a manner that she could understand during her arrest or later upon her arrival at the precinct.

46. Ms. Ingram was first taken to the 25th police precinct, where she remained for approximately four hours before being transferred to another precinct. Upon her arrival there, an officer appeared to be asking her if she could read his lips. Ms. Ingram did not respond affirmatively, but instead tried to indicate that she needed her hands to communicate. In spite of her response, the officer did not remove her handcuffs. Ms. Ingram saw that Officer Outlaw and

two other officers were visibly laughing, appeared to be mocking her, and made inappropriate faces at her.

47. Ms. Ingram was locked in a cell for hours, during which time no one attempted to communicate with her in a manner that she could understand, such as writing or sign language. She was not given her *Miranda* warnings or an explanation as to the reason for her arrest and detainment. No sign language interpreter was provided for her.

48. Hours after her arrival at the precinct, Officer Troyer came to take Ms. Ingram for fingerprinting. Ms. Ingram did not understand why Officer Troyer needed to take her fingerprints. Officer Troyer finally wrote Ms. Ingram a note stating that Ms. Perez had told the police that Ms. Ingram had attacked her. This note was the first time that anyone attempted to explain to Ms. Ingram why she was being detained. Ms. Ingram wrote a note back to him indicating that the officers did not let her tell her side of the story. Officer Troyer responded in writing that they did not need her side of the story—despite the fact that it had been Ms. Ingram who contacted the police for assistance in the first place.

49. Ms. Ingram was eventually taken from the precinct in Harlem to central booking in Chinatown, where she remained in pain, handcuffed and crying. Police officers at central booking appeared to speak aloud to her, but she could not understand them. Ms. Ingram was again taken for fingerprinting and an eye scan. No further attempts were made to communicate with her using gestures or writing, and no sign language interpreter was provided.

50. During this time, Ms. Ingram noticed that she was the only arrestee who was handcuffed with her hands behind her back. Being handcuffed in this way further restricted her ability to communicate because she could not use gestures or sign language.

10

51. From Chinatown, Ms. Ingram was again transported, this time to Harlem Hospital Center. At no time was Ms. Ingram informed where she was being taken or why. At Harlem Hospital Center, Ms. Ingram was examined by a physician. The treating physician was aware that Ms. Ingram was deaf, and communicated with her in writing. The treating physician, quoting the NYPD, noted in his records that "'pt. is deaf, she needs to be medically cleared', as per NYPD." The treating nurse gave a prescription for Ms. Ingram's pain to the police officers, but Ms. Ingram never received the prescription or the medication.

52. Ms. Ingram spent the rest of the night at the Midtown North Precinct, still in pain, handcuffed, and crying.

53. In total, Ms. Ingram was held in custody for approximately 24 hours. As a result, she missed two days of work.

**D.    The Meritless Prosecution And Ultimate Dismissal Of Charges Against Plaintiff**

54. Following her arrest, Ms. Ingram was charge with four misdemeanors: menacing, criminal possession of a weapon, harassment, and resisting arrest.

55. Ms. Ingram was forced to appear in court three times because of the specious charges brought against her. Ultimately, on July 31, 2013, the prosecutor dismissed all of the charges brought against Ms. Ingram.

56. Notably, because Ms. Ingram never was informed she was being arrested as a result of the officers' refusal to communicate with her, Ms. Ingram never had the opportunity comply with the arrest. The resisting arrest charge thus resulted directly from a failure to provide Ms. Ingram—who was sitting in her car at the accident scene for more than an hour before her arrest—a reasonable accommodation during arrest.

\* \* \* \* \*

57. After requesting the NYPD's assistance with a minor traffic accident, Ms. Ingram repeatedly indicated to the officers through gestures and writings that she is deaf and cannot hear, but the officers refused to provide any effective means of communication. No sign language interpreter was ever provided, and the officers would not even write a note to Ms. Ingram to inform her of what was happening. The officers instead spoke only with the other driver involved in the accident, a hearing woman, and made openly mocking gestures directed at Ms. Ingram.

58. The officers then forcibly arrested Ms. Ingram, handcuffed her, which thereby eliminated her ability to attempt to communicate, unnecessarily detained her for nearly 24 hours, required medical clearance for her release because she is deaf, and prosecuted for months criminal charges against Ms. Ingram with no reasonable chance of conviction.

59. As a direct and proximate cause of the NYPD's refusal to provide accommodation for Ms. Ingram's disability on February 26-27, 2013 by failing to provide a sign language interpreter, or even trying alternative communications such as writing notes, Ms. Ingram has suffered and continues to suffer physical pain, mental anguish, and other losses.

**FIRST CLAIM FOR RELIEF**
**Discrimination Under the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*.**

60. Plaintiff incorporates and realleges paragraphs 1 through 59 of this Complaint as if fully restated herein.

61. The Americans with Disabilities Act provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

12

62. Federal regulations that implement the ADA provide that public entities "shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). The regulations further provide, "A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." 28 C.F.R. § 35.160(b)(1).

63. At all times relevant to this action, Ms. Ingram has been a Deaf woman who communicates via American Sign Language, and is considered a qualified individual with a disability.

64. The City and the NYPD are public entities that engage in activities, services, and programs, including responding to traffic accidents, performing arrests, and detaining individuals under arrest.

65. At all relevant times, Police Officer Daniel Troyer and Police Officer K. D. Outlaw were acting in their capacities as officers, employees, and agents of the NYPD and the City.

66. Defendant and its officers who interacted with Ms. Ingram were aware of Ms. Ingram's disability.

67. The ADA requires Defendant to take appropriate steps to ensure that communication between Deaf arrestees and the police is at least as effective as communication that would occur between the police and hearing arrestees. These requirements also apply to post-arrest detention.

68. Defendant failed to provide reasonable accommodations for Ms. Ingram's disability in spite of her request for such accommodations. No sign language interpreter was provided at the scene of the accident or after Ms. Ingram was taken into custody, even though Ms. Ingram clearly indicated that she could not communicate verbally. The officers did not even attempt to accommodate Ms. Ingram by communicating using pen and paper or other readily available means.

69. Once Ms. Ingram was arrested, Defendant refused to release her until she had received medical clearance, and specifically informed treating physicians that she needed to be medically cleared because she is deaf.

70. Accordingly, Defendant discriminated against Ms. Ingram on the basis of her disability and excluded her from participation in and denied her the benefit of their services, in violation of the ADA.

71. As a proximate cause of these actions, Ms. Ingram has suffered and continues to suffer physical pain, mental anguish, and other losses.

## SECOND CLAIM FOR RELIEF
### Discrimination Under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

72. Plaintiff incorporates and realleges paragraphs 1 through 71 of this Complaint as if fully restated herein.

73. Section 504 of the Rehabilitation Act provides, "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

74. At all times relevant to this action, Ms. Ingram has been a deaf woman who communicates via American Sign Language, and is considered a qualified individual with a disability.

75. The City and the NYPD are public entities that engage in activities, services, and programs, including responding to traffic accidents, performing arrests, and detaining individuals under arrest.

76. The City is a recipient of federal funding and/or financial assistance and is thus subject to the requirements of the Rehabilitation Act.

77. At all relevant times, Police Officer Daniel Troyer and Police Officer K. D. Outlaw were acting in their capacities as officers, employees, and agents of the NYPD and the City.

78. Defendant and its officers who interacted with Ms. Ingram were aware of Ms. Ingram's disability.

79. Defendant failed to provide reasonable accommodations for Ms. Ingram's disability in spite of her request for such accommodations. No sign language interpreter was provided at the scene of the accident or after Ms. Ingram was taken into custody, even though Ms. Ingram clearly indicated that she could not communicate verbally. The officers did not even attempt to accommodate Ms. Ingram by communicating using pen and paper or other readily available means.

80. Once Ms. Ingram was arrested, Defendant refused to release her until she had received medical clearance, and specifically informed treating physicians that she needed to be medically cleared because she is deaf.

81. Accordingly, Defendant discriminated against Ms. Ingram on the basis of her disability and excluded her from participation in and denied her the benefit of their services, in violation of the Section 504 of the Rehabilitation Act.

82. As a proximate cause of these actions, Ms. Ingram has suffered and continues to suffer physical pain, mental anguish, and other losses.

## THIRD CLAIM FOR RELIEF
### Violation of New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(4).

83. Plaintiff incorporates and realleges paragraphs 1 through 82 of this Complaint as if fully restated herein.

84. The New York City Human Rights Law provides, "It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation, because of . . . disability . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . ." N.Y.C. Admin. Code § 8-107(4).

85. The NYCHRL further requires "reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15)(a).

86. The NYCHRL applies to "governmental bodies or agencies," N.Y.C. Admin. Code § 8-102(1), which includes the City and the NYPD.

87. At all times relevant to this action, Ms. Ingram has been a deaf woman who communicates via American Sign Language, and is considered a person with a disability.

88. Defendant and its officers who interacted with Ms. Ingram were aware of Ms. Ingram's disability.

16

89. Defendant failed to provide reasonable accommodations for Ms. Ingram's disability in spite of her request for such accommodations. No sign language interpreter was provided at the scene of the accident or after Ms. Ingram was taken into custody, even though Ms. Ingram clearly indicated that she could not communicate verbally. The officers did not even attempt to accommodate Ms. Ingram by communicating using pen and paper or other readily available means.

90. Once Ms. Ingram was arrested, Defendant refused to release her until she had received medical clearance, and specifically informed treating physicians that she needed to be medically cleared because she is deaf.

91. Defendant discriminated against Ms. Ingram on the basis of her disability by withholding and denying her the accommodations, advantages, facilities, and/or privileges of Defendant's services.

92. Defendant further discriminated against Ms. Ingram by failing to provide reasonable accommodations to ensure effective communications.

93. As a proximate cause of these actions, Ms. Ingram has suffered and continues to suffer physical pain, mental anguish, and other losses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Tanya Ingram prays that the Court grant the following relief:

(A)  Enjoin the City from engaging in any act or practice that discriminates against any individual in the execution of its services, programs, and activities on the basis of disability in violation of Title II of the ADA and Section 504 of the Rehabilitation Act;

(B) Order the City and the NYPD to provide training on Title II of the ADA and Section 504 of the Rehabilitation Act, including the duty to make reasonable accommodations, to all current and future City and NYPD supervisory employees and all City and NYPD employees who participate in law enforcement activities, including, but not limited to, making arrests;

(C) Award compensatory damages to Ms. Ingram as would fully compensate her for injuries caused by the NYPD's discriminatory conduct; and

(D) Award punitive damages to Ms. Ingram for the City and NYPD's intentional, reckless, and negligent conduct;

(E) Award Ms. Ingram her attorneys' fees and costs for this action;

(F) Award Ms. Ingram interest on all applicable amounts at the highest rates and from the earliest dates allowed by law; and

(G) Award such other additional relief as justice may require.

## JURY DEMAND

Plaintiff hereby demands trial by jury for all issues properly triable thereby.

Dated: February 24, 2016
      New York, New York

                              Respectfully submitted,

                              QUINN EMANUEL URQUHART
                                & SULLIVAN LLP

                              By: _____
                              Eric Hui-chieh Huang
                              erichuang@quinnemanuel.com
                              Ron Hagiz
                              ronhagiz@quinnemanuel.com
                              51 Madison Avenue, 22nd Floor,
                              New York, New York  10010-1601
                              Tel.: (212) 849-7000
                              Fax: (212) 849-7100

                              *Attorneys for Plaintiff Tanya Ingram*